ELTON BRIMBERRY and NORMA LOUISE BRIMBERRY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brimberry v. Commissioner
Docket No. 3028-72.
United States Tax Court
T.C. Memo 1976-209; 1976 Tax Ct. Memo LEXIS 197; 35 T.C.M. (CCH) 900; T.C.M. (RIA) 760209; June 28, 1976, Filed Dougal C. Pope, for the petitioners. Charles N. Woodward, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in Federal income tax of petitioners Elton and Norma Louise Brimberry for the calendar years 1966, 1967 and 1968 in the amounts of $20,875.71, $49,213.25 and $32,500.13, respectively. Due to concessions by the parties, the only issue for our decision is whether petitioners are entitled to deductions for a partially worthless business bad debt under section 166(a)(2), I.R.C. 1954, [1] for the calendar years 1967 and 1968 for a loan in the amount of $175,000 that Elton Brimberry had made *198 to a church during June 1967. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of their petition in this case, petitioners Elton and Norma Louise Brimberry (petitioners) resided in Houston, Texas. Petitioners filed joint Federal income tax returns for the calendar years 1966 through 1969 with the Director of the Internal Revenue Service Center, Austin, Texas. Petitioner Elton Brimberry (Mr. Brimberry) has been in the construction business for many years. In an effort to acquire a general building contract from Mid-City Baptist Church, New Orleans, Louisiana (the church), for the completion of a high-rise apartment complex proposed by the church, Mr. Brimberry loaned the church on June 24, 1967, the amount of $175,000. This loan was evidenced by the church's promissory note dated June 26, 1967, in the principal amount of $175,000 payable to Mr. Brimberry on or before December 23, 1967. The note was secured by a pledge of the church's first mortgage series C bonds in the principal amount of $231,000. The first mortgage bonds *199 were secured by the church's real property located on Airline Highway, New Orleans on which was situated the church's sanctuary, educational building, a high school, and a gymnasium. The first mortgage series C bonds were additionally secured by the personal property located in these buildings. As shown by the church's financial statement dated July 31, 1968, there was outstanding the principal amount of $3,257,250 of its first mortgage bonds of which the principal amount of $2,507,250 was series C bonds. Additionally, the church had outstanding revenue bonds in the principal amount of $128,210 and first mortgage bonds in the principal amount of $1,220,000 which were secured by the real property on which the church had proposed to build the apartment complex. On November 8, 1967, the Securities and Exchange Commission filed a complaint against the church and related parties for their alleged violation of the Securities Act of 1933 with respect to the sale of the church's bonds. This complaint alleged that the church did not have sufficient funds to repay the $175,000 loan due December 1967, to make required sinking fund payments due January 1968, and to repay the first mortgage *200 bonds as they became due and to continue to pay interest thereon, and that the church's liabilities including bond obligations of at least $4.1 million exceeded its assets. As a result of the complaint, the church was placed in receivership on November 21, 1967, by order of the United States District Court for the Eastern District of Louisiana. A receiver was subsequently appointed by that court. On July 30, 1968, the church filed a petition with the court for its reorganization under Chapter X of the Bankruptcy Act. The church's petition alleged that it was unable to pay its present and past obligations and that proceedings under Chapter X would ensure the payments of part if not all of the church's creditors' claims. Shortly thereafter the petition was granted and a trustee in reorganization for the church was appointed by the court. The financial condition of the church on December 31, 1967 and 1968 was substantially the same as that reflected in a financial statement dated July 31, 1968, prepared by independent certified accountants for the church in reorganization. This financial statement included the following balance sheet of the assets and liabilities of the church *201 as of July 31, 1968: ASSETS
Cash on hand
$ 200.00
Cash in banks ($2,346.49 restricted)
2,709.75
Homestead shares (pledged to secure payments
under real estate lease)
20,000.00
Accounts receivable
11,441.67
Bookstore inventory (estimated)
28,000.00
School buses and mobile home at estimated fair
market value (partially mortgaged)
47,700.00
Furnishings and equipment at appraised value
(mortgaged to secure Series C bonds)
299,144.00
Real estate (mortgaged)
5,173,634.00
Cemetery lots - at cost
1,000.00
Total
$5,583,829.42
LIABILITIES
Bank overdraft
$ 6,380.46
Accounts payable
Prior to receivership (November 30, 1967)
$54,092.99
Subsequent to November 30, 1967
20,138.33
74,231.32
Payroll taxes
6,898.89
Accounts receivable credit balances
4,472.69
Contracts payable: Equipment
$ 6,511.86
Real estate (secured by homestead
shares)
20,000.00
26,511.86
Accrued rent
1,200.00
Accrued interest: Notes and mortgages
$44,468.33
Bonded debt
313,187.50
357,655.83
Notes and mortgages payable
777,295.37
Bonded debt
4,605,450.00
Contingent
$5,860,096.42
DEFICIT
Excess of liabilities over assets
276,267.00
Total
$5,583,829.42
*202 The notes accompanying the balance sheet stated that the church was contingently liable for $1,018,000 for outstanding bonds for which no consideration had been received, which bonds remained unrecovered, $65,517.50 for an architect's lien, $293,104.57 under a construction contract, and $8,193.26 for a lien for materials and supplies. Furthermore, such notes indicated that it had been established that the church had no liability with respect to $425,000 of the unrecovered bonds and that it was anticipated that there would be no liability with respect to an additional $175,000 of unrecovered bonds. The church's real estate assets included the aforementioned parcel of real property on which were situated its sanctuary and related buildings which was shown by a schedule attached to the balance sheet to have had a value of $4,537,084 based upon an appraisal report by a realtor dated October 1966. Another of the church's real estate assets listed in the attached schedule was a parcel of land on which the church had proposed to construct an apartment complex. This asset had an assigned value of $415,000 based upon an appraisal dated September 1968. Accompanying the financial statement, *203 an uncertified statement of receipts and disbursements for the church and its related enterprises which included the operation of a private school, a bookstore, a cafeteria, and buses for the fiscal year ended June 30, 1968, showed gross operating receipts of $593,212.83, [2] an excess of operating receipts over disbursements of $34,501.67, and a deficit of $7,701 after accounting for all receipts and disbursements, including capital items. [3]
*204 The church's financial statement for the fiscal year ended June 30, 1969, included an uncertified balance sheet which reflected the following assets and liabilities of the church as of June 30, 1969: ASSETS
Cash on hand
$ 350.00
Cash in banks ($2,346.49 restricted)
65,591.85
Homestead shares (pledged as collateral for payments
under real estate lease)
17,235.41
Accounts receivable
21,533.87
Vendor's debit balance
2,754.00
Advance to Trustee for expenses
1,287.84
Bookstore inventory (estimated)
12,000.00
School buses and mobile home at estimated fair
market value (partially mortgaged)
33,300.00
Furnishings and equipment at appraised value
(mortgaged to secure Series C bonds)
299,144.00
Real estate (mortgaged)
5,169,234.00
Cemetery lots - at cost
1,000.00
Total
$5,623,430.97
LIABILITIES
Accounts payable: Prior to receivership (November 30, 1967)
$54,332.47
Subsequent to November 30, 1967
6,040.41
$ 60,372.88
Accounts receivable credit balances
2,899.41
Contracts payable: Equipment
$ 6,511.86
Real estate (collateralized by homestead
shares)
20,000.00
26,511.86
Deposits of 1969-70 registration fees
9,495.00
Accrued interest: Notes and mortgages
$ 63,604.86
Bonded debt
313,187.50
376,792.36
Notes and mortgages payable
770,694.23
Bonded debt
4,605,450.00
Contingent
$5,852,215.74
DEFIGIT
Excess of liabilities over assets
228,784.77
Total
$5,623,430.97
*205 The accompanying notes to the balance sheet indicated the church had the same contingent liabilities that it had in the prior fiscal year except with respect of the materials' lien for which there was no contingent liability. The notes stated that the balance sheet did not reflect administrative fees payable since the church was placed in receivership. A note to the accompanying schedule of bonded indebtedness stated that interest had not been accrued beyond July 31, 1968, at which date the total indebtedness of the bonds exceeded the estimated value of the collateral. A note to the accompanying schedule of notes and mortgages payable stated that accrued interest had been computed to June 30, 1969, on all notes other than notes secured by chattel mortgages and on the note which had an outstanding balance of $439,654.72 to a particular bank which was secured by the church's real property on which were located its sanctuary and related buildings since on July 31, 1968, the total indebtedness exceeded the estimated value of the collateral. The uncertified statement of receipts and disbursements for the fiscal year ended June 30, 1969, showed that the church had total operating receipts *206 of $639,007.96 including the approximate amounts of $210,000 for offerings, $270,000 for tuition, $33,000 for bus receipts, $31,000 for cafeteria receipts, and $29,000 for bookstore receipts, and total operating disbursements of $574,425.29. An uncertified statement of operating receipts and disbursements for the fiscal year ended June 30, 1970, indicated gross receipts of $534,242.10 including the approximate amounts of $144,000 for offerings, $233,000 for tuition, $30,000 for bus receipts, $24,000 for cafeteria receipts, and $23,000 for bookstore receipts, and disbursements of $555,093.57. The church's real property on which were located its sanctuary and related buildings and the equipment therein were leased to the Friends of Mid-City Baptist Church, Inc., by the church's trustee in reorganization for $1,000 per week from July 8, 1970 to June 30, 1971. This lease was subsequently renewed for the fiscal year ended June 30, 1972, and for the fiscal year ended June 30, 1973, essentially upon the same terms. Friends of Mid-City Baptist Church, Inc. (Friends), was supported by the same congregation that had always attended Mid-City Baptist Church. Friends had gross receipts of $355,793.58 *207 and $326,970.18 and gross disbursements of $359,046.73 and $319,915.36 for fiscal years ended June 30, 1971 and 1972, respectively. For its fiscal year 1971 it had the approximate amounts of $117,000 for offerings, $207,000 for tuition, $17,000 for bookstore receipts, and $13,000 for cafeteria receipts. For its fiscal year 1972 it had the approximate amounts of $96,000 from offerings, $193,000 from tuition, $19,000 of bookstore receipts, and $18,000 of cafeteria receipts. On June 22, 1972, an agreement was executed to sell the proposed apartment complex site for $245,000 on or before September 18, 1972. The greatest net return the church's land and improvements located thereon could provide was for the improved land to be used as a church and school. As of May 13, 1972, based on recorded sales, the land had a value of $2.75 per square foot. Based on reproduction costs less physical depreciation the church buildings at this date had a value of $2,775,769, computed as follows: Reproduction Cost Estimate
Church --
Reproduction cost of building
11,016 square feet at 53.16
$ 585,610
Less Accrued Depreciation
281,093
$ 304,517
This building has a remaining
economic life of 31 years
Educational Building --
Reproduction cost of building
32,046 square feet at 28.43
911,068
Less Accrued Depreciation
382,649
528,419
This building has a remaining
economic life of 34 years
High School Building --
Reproduction cost of building
68,956 square feet at 24.93
1,719,073
Less Accrued Depreciation
515,722
1,203,351
This building has a remaining
economic life of 40 years
Gymnasium-Cafeteria --
Reproduction cost of building
29,901 square feet at 35.33
1,056,402
Less Accrued Depreciation
316,920
739,482
This building has a remaining
$2,775,769
economic life of 40 years
*208 The aggregate value of the land and improvements based on reproduction cost less physical depreciation was $2,998,878 as of May 13, 1972. [4] Commercial construction costs had risen in the New Orleans area approximately 5 to 15 percent per year from 1967 to 1972. A purchaser of a church property would be expected to pay less for an existing building than its replacement cost less physical depreciation. Based on the best economic use of the improved land as a church and school and given the use of this land by a congregation that was unable to pay substantially in excess of $52,000 per annum to support any debt financing, the amount which would be paid by the congregation for the church property would be approximately $975,000 for the land and the buildings as of December 31, 1967. The church property was listed with a realtor for approximately 6 months from late 1972 to early 1973 for sale for the amount of $3 million. An order of the Federal District Court for the Eastern District of Louisiana dated November 14, 1973, denied confirmation *209 of the highest bid of $520,000 for the church's real property obtained at a public sale held on September 18, 1973, and authorized the private sale of that property for $750,000. The property was sold to another church congregation in 1973 for this amount. As of June 3, 1975, Mr. Brimberry had not received any distribution from the receiver or trustee in reorganization although at that time his claim had been filed and was still pending before the bankruptcy court. With respect to Mr. Brimberry's loan of $175,000 to the church, petitioners on their income tax return for 1967 deducted the amount of $100,000 for a "loss on business venture," and on their 1968 return deducted the amount of $75,000 as a "bad debt arising from sales or services." In his notice of deficiency to petitioners, respondent disallowed petitioners' claimed deduction for 1967 of $100,000 "loss on business venture" and their claimed bad debt deduction of $75,000 for 1968. OPINION Petitioners contend that they are entitled to a partially worthless bad debt deduction in the amount of $100,000 for 1967 and $69,750 for 1968, on account of the loan of $175,000 that Mr. Brimberry had made to the church. [5] *210 They argue that the debt became worthless by these amounts during these years. In this regard petitioners point out that as of December 31, 1967, the excess of the church's actual and contingent liabilities of $5,860,096.42 and $1,384,815.33, respectively, over its assets of $2,021,745.42, assuming the church's land had a value of $975,000 rather than $4,537,084, indicated a creditor could not expect to receive more than $0.28 on the dollar. They argue that even $0.28 on the dollar is an excessive value for the debt in 1968 since the church had been placed in receivership in 1967 and was in reorganization under Chapter X of the Bankruptcy Act in 1968. Petitioners also contend that respondent's determination is arbitrary and the presumption as to its correctness should be set aside and the burden of proof shifted to respondent to show the correct amount of the deficiency, if any. Petitioners apparently have abandoned on brief the claim made in their amendment to petition that the debt became worthless during the calendar year 1969 when they failed to timely file a claim in the "bankruptcy" proceeding and that a deduction of the $175,000 in 1969 resulted in a carryback of net operating *211 loss sustained during that year to the calendar years 1967 and 1968. In any event, the parties by oral stipulation at trial agreed that petitioners had filed a claim in the proceedings by the church under the bankruptcy act and the claim was pending at the date of the trial. Respondent contends that his disallowance of petitioners' claim of a partially worthless business bad debt deduction for each of the calendar years 1967 and 1968 was a reasonable exercise of his discretion and that petitioners have not established that their loan to the church became partially worthless in 1967 or 1968. Respondent's determination in the statutory notice of deficiency is presumptively correct and a taxpayer has the burden to show that respondent's *212 determination is arbitrary or erroneous. Helvering v. Taylor,293 U.S. 507 (1935); Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. If the taxpayer presents sufficient evidence to support a finding that respondent's determination is arbitrary, then the presumption of its correctness disappears and the burden of proof shifts to respondent to show the existence and amount of any deficiency. On the basis of the record before us we conclude that respondent's notice of deficiency was not arbitrary. There is nothing in this record to support petitioners' contention that respondent's determination was arbitrary or capricious. In fact it is clear to us that respondent's determination had a rational basis. With respect to his disallowance of petitioners' deductions for the loan made to the church, respondent explained that petitioners had not established that the bonds became worthless in 1967 and that the debt became worthless in 1968. Petitioners do not even now contend that they are entitled to a deduction for the entire amount of the loan in 1967 and 1968 since they concede that they still reasonably *213 expect to have the amount of $5,250 of their loan repaid. Under the facts here we conclude that petitioners have failed to show that respondent's determination was arbitrary and therefore invalid. Consequently, unless petitioners have proved that respondent's determination is erroneous, his determination is presumptively correct. Section 166(a)(2) generally provides for a deduction for the partial worthlessness of a debt to the extent that the taxpayer is able to demonstrate to the satisfaction of respondent that, upon consideration of all the facts and circumstances, including the value of the collateral securing the debt and the financial condition of the debtor, the debt is only recoverable in part. See section 1.166-2(a) and section 1.166-3(a)(2), Income Tax Regs. The courts have recognized that respondent has a certain amount of discretion in making his determination with respect to deductions for the partial worthlessness of a debt and that such determination should not be disturbed unless it is plainly arbitrary and unreasonable. Giles E. Bullock,26 T.C. 276, 299 (1956), affd. per curiam 253 F. 2d 715 (2d Cir. 1958), and cases cited therein. *214 Both parties agree that Mr. Brimberry did in fact make a bona fide loan to the church, that his loan was created in connection with his construction business and that he charged off the amounts of $100,000 and $75,000 of this loan in the calendar years 1967 and 1968, respectively. We do not attach any independent significance to the fact that the church was placed in receivership as a result of a complaint filed by the Securities and Exchange Commission nor to the proceeding for reorganization of the church under Chapter X of the Bankruptcy Act. The allegations made in the complaint of the Securities and Exchange Commission with respect to the church's financial condition are not totally in accord with the record in this case. The purpose of the placement of the church into receivership and later a Cahpter X reorganization was to marshall and preserve its assets and to nurture the church back to financial stability while protecting the interests of its creditors. See Giles E. Bullock,supra at 300. While these events may have affected the church's financial condition, the record here does not demonstrate the effect of these events at the time they occurred. *215 From subsequent events it appears that the church did not suffer any significant loss of revenue during 1967 and 1968 since it continued at approximately the same level of net operating income during its fiscal years ending June 30, 1968, 1969, and 1970. The congregation continued to provide substantial financial support to the church through their offerings until at least July 1970. The school continued to be patronized and the church received substantial receipts from tuition, the cafeteria, and the bookstore for its fiscal years ended June 30, 1968, 1969, and 1970. Bankruptcy is generally an indication of the partial worthlessness of an unsecured and unpreferred debt. Section 1.166-2(c)(1), Income Tax Regs. However, during the years here involved the church had not been declared bankrupt and liquidation of its assets had not commenced. It was still in reorganization, attempting to work out a method to pay its debts. Mr. Brimberry's loan to the church was secured by bonds in the principal amount of $231,000 that were secured by the church's real property on which its sanctuary and other buildings were situated. If a plan of reorganization had been proposed and approved, *216 it may have been that Mr. Brimberry would have been paid in full under the plan. The parties have stipulated that the church's financial statement of July 31, 1968, substantially reflected the financial condition of the church as of December 31, 1967, and December 31, 1968. This statement reflects that the church's improved real property had a value of $4,537,084 based on an appraisal dated October 1966 and that this property and the personal property situated therein were collateral for outstanding first mortgage bonds in the principal amount of approximately $3.25 million of which bonds in the principal amount of $231,000 secured the church's note to Mr. Brimberry in the amount of $175,000. The statement indicates that the liabilities of the church as of that date exceeded its assets by $276,267. Petitioners assert that the church was insolvent to the additional extent of $1,383,000 since its liabilities as shown by the balance sheet did not include its contingent liabilities of approximately that amount. Petitioners argue that the value of the church's improved real property shown on the balance sheet as $4,537,084 was actually only $975,000 as of December 31, 1967. They *217 contend that the approximately $3,500,000 difference in the two figures is a further increase in the extent of the insolvency of the church. The contingent liabilities of approximately $1,383,000 included the amount of $1,018,000 of church bonds that were outstanding without the church having received consideration or recovered the bonds. The church was contingently liable with respect to the construction of the proposed apartment complex for approximately $65,000 for an architect's lien and approximately $300,000 for foundation work. There is no basis in this record to conclude that these liabilities which an independent auditor found to be contingent might be reasonably considered actual liabilities of the church. The reproduction cost of the church's improvements less physical depreciation was approximately $1.67 million in 1967, assuming that construction costs increased at the rate of 10 percent per year from 1967 through 1972. A congregation purchasing the premises would be expected to pay less than this amount since generally a congregation would prefer to construct buildings particularly adapted to its own liking. It is clear that the best use of the premises was *218 for religious and/or educational purposes and that the costs of conversion to another use would be sufficiently high to cause a sale for other purposes to be unlikely.The record does not disclose whether during 1967 and 1968 there were any organizations in the area which were interested in acquiring property for religious and educational purposes. Assuming that there were, the church's property would have brought on a sale to one of them something less than the underlying value of the land and the reproduction costs of the buildings less physical depreciation which we compute to have been approximately $1.9 million as of December 31, 1967. If there were no organizations interested in purchasing buildings of this nature in 1967 and 1968 at approximately reproduction costs less depreciation as apparently was the situation during late 1972 and early 1973 and the church property had to be liquidated in a forced sale, the property probably would have brought no more than the $975,000 which petitioners' expert estimated it would have brought had it been sold in 1967. However, our determination that the fair market value of the assets of the church if these assets were sold was overstated *219 at least to the extent of $2.6 million and possibly to the extent of $3.5 million on the financial statement of July 31, 1968, which the parties agree reflected the financial condition of the church during 1967 and 1968 is not dispositive of the issue before us. Even though the value of the collateral underlying the bonds was less than shown on the financial statement, the record in this case is devoid of evidence to show that as of the close of the calendar years 1967 and 1968 the financial condition of the church was so impaired that the church had no reasonable chance of repaying in full its creditors, including Mr. Brimberry. The donations and other receipts of the church were being maintained at the level they were when the bonds were sold and when Mr. Brimberry made the loan. These receipts were the expected source of payment of indebtedness of the church. Other than the appointment of a receiver and the granting of the petition of the church to be placed in a Chapter X reorganization, there is no evidence in the record to indicate that there was any change in the financial condition of the church from the date during June 1967 when the loan was made to the end of that or *220 the next calendar year. As heretofore pointed out the purpose of the Chapter X proceeding is to develop a plan for payment of creditors in such a manner as to enable the debtor in reorganization to regain its financial stability. The evidence here does not support a conclusion that petitioners had any less expectation of being repaid the amount of the loan at the end of 1967 or the end of 1968 than when the loan was made. The record of this case does not persuade us that there were any circumstances in 1967 and 1968 from which it could be reasonably determined that the church was insolvent to such an extent that the amount of the note was recoverable only in part. Consequently, under the facts and circumstances of this case we conclude that respondent did not act unreasonably in disallowing petitioners' claimed deductions with respect to Mr. Brimberry's loan to the church and we conclude that petitioners are not entitled to a business bad debt deduction in any amount for the calendar years 1967 and 1968 for the partial worthlessness of the church's debt to Mr. Brimberry. Due to concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Among the operating receipts were the following approximate amounts: Offering of $145,000, tuition of $285,000, cafeteria receipts of $44,000, bus receipts of 40,000, and bookstore receipts of $32,000. ↩
3. A schedule attached to the balance sheet showed, as we have found to be a fact, outstanding bonds in the amount of $4,605,450 of which $3,257,250 were first mortgage bonds which were secured by the real property on which the sanctuary and related buildings were situated and the personal property located therein and $1,220,000 were first mortgage bonds secured by the real property on which the apartment complex was to be built and the balance was revenue bonds which were secured by the assignment of the first week's revenue from the church in a sum sufficient to pay interest and retire the bonds at maturity.↩
4. The appraiser on whose testimony these facts are based determined that the land had 16,408 square feet more than it actually had.↩
5. Petitioners in their petition allege that they had a business loss of $100,000 in 1967 and $75,000 in 1968 or in the alternative the full $175,000 in one of these years because of Mr. Brimberry's loan of the $175,000 on a promise of a construction contract. However, on brief they contend only for a deduction for a partial bad debt of $100,000 in 1967 and $69,750 in 1968 or in the alternative a $169,750 partial bad debt deduction in 1968.↩