T.C. Memo. 1997-309

UNITED STATES TAX COURT

KAPS WAREHOUSE, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5795-95.                    Filed July 3, 1997.

<u>D. James Manning</u>, for petitioner.

<u>Virginia L. Hamilton</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>: Respondent determined deficiencies in petitioner's Federal income taxes for its fiscal years ended March 31, 1991 and 1992, in the respective amounts of $82,691 and $94,695 and accuracy-related penalties for these years under section 6662(b)(2) in the respective amounts of $16,538 and $18,939.

Following concessions by petitioner, the issues remaining for decision are: (1) Whether respondent properly reallocated to petitioner $176,548 for its fiscal year ended March 31, 1991, and $155,000 for its fiscal year ended March 31, 1992, from three of its related entities pursuant to section 482; and (2) whether petitioner is liable for the accuracy-related penalties pursuant to section 6662(b)(2) for both of the aforementioned fiscal years.

All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

### Kaps Warehouse, Inc.

Kaps Warehouse, Inc., an Idaho corporation, had its principal place of business in Blackfoot, Idaho, at the time it filed its petition. Petitioner reports its income on the basis of a fiscal year ending March 31. It timely filed its corporate income tax returns for its fiscal years ended March 31, 1991 (fiscal year 1991), and March 31, 1992 (fiscal year 1992).

Petitioner is a wholesaler of automotive parts and supplies. It was originally founded by O. Reed Kirkham (presently retired) in

1945 as a "jobber"[1] of automotive parts. At all relevant times, petitioner's operations comprising petitioner, one other related wholesale warehouse, and 24 related retail stores. Each of the related entities to which petitioner sold merchandise was a separate legal entity. Petitioner also sold merchandise to unrelated entities.

During the years at issue, petitioner's stockholders and their respective percentage ownership interests were as follows: Michael Kirkham (M. Kirkham)--25 percent; James Kirkham (J. Kirkham)--25 percent; Linda Sponenburgh (L. Sponenburgh)--25 percent; and O. Reed and Ruth Kirkham (O.R. and R. Kirkham)--25 percent. M. Kirkham, J. Kirkham, and L. Sponenburgh are the children of O.R. and R. Kirkham, and William Sponenburgh is the husband of L. Sponenburgh.

Petitioner's Related Entities

Petitioner's related entities purchased approximately 95 percent of their merchandise from petitioner.

The Kirkham family formed Kirkham Auto Parts Service Co. (Kapsco), an S corporation, in the early 1960's. During the years at issue, Kapsco's shareholders and their respective percentage ownership interests were as follows: O.R. Kirkham--23 percent; R.

---

[1]    In the terminology of the industry, a jobber of automotive parts purchases automotive parts from a warehouse distributor or manufacturer and sells the parts to installers (such as a service station) or to retail stores which then sell the parts to the consumer.

Kirkham--23 percent; J. Kirkham--18 percent; M. Kirkham--18 percent; and L. Sponenburgh--18 percent. At all relevant times, Kapsco was a going concern.

Kapsco operated 10 retail stores in fiscal year 1991 and 9 retail stores in fiscal year 1992. Kapsco's retail stores during those years were primarily located in eastern Idaho and included the following: (1) Blackfoot; (2) Driggs; (3) Idaho Falls--Milligan; (4) Idaho Falls--Park; (5) Montpelier; (6) Pocatello; (7) Rigby; (8) Shelley; (9) American Falls; and (10) Rexburg. The retail stores were not separately incorporated.

In order to expand their sales base, the Kirkham family organized Kaps Automotive Warehouse, Inc. (KAW), in 1979. During the years at issue, KAW's shareholders and their respective percentage ownership interest were as follows: Petitioner--25 percent; J. Kirkham--25 percent; M. Kirkham--25 percent; L. Sponenburgh--25 percent. At all relevant times, KAW was a going concern.

In 1979, KAW acquired Nordling Parts Co. of Twin Falls (NPC). (Although KAW acquired 100 percent of NPC's stock, NPC's original income tax returns for fiscal years 1991 and 1992 indicate that KAW owned only 75 percent of NPC's stock.) NPC was KAW's jobber (or retail) store. At all relevant times, NPC was a going concern.

During the years at issue, the officers of petitioner, Kapsco, NPC, and KAW were: M. Kirkham--president; J. Kirkham--vice president; and W. Sponenburgh--secretary.

Petitioner performed all accounting functions for itself, Kapsco, NPC, and KAW.

Volume Discounts Petitioner Received From Its Suppliers

Petitioner received volume discounts from its suppliers. The record does not indicate the amount of the volume discounts, the effect the discounts had on petitioner's financial position, or the sales volume petitioner had to maintain in order to obtain the volume discounts.

Petitioner's Sales and "Rebates" Extended to Petitioner's Related Stores

Petitioner sold the same items to related and unrelated stores at the same price. However, petitioner gave "rebates" to certain of its related entities, as follows:

| 1991 | Amount | 1992 | Amount |
|---|---|---|---|
| Kapsco stores | | NPC | $115,000 |
|   Idaho Falls--Park | $46,000 | | |
|   Pocatello | 46,000 | KAW | 40,000 |
|  Rigby | 14,000 | Total | 155,000 |
|   Rexburg | 14,000 | | |
| NPC | 56,548 | | |
|   Total | 176,548 | | |

Petitioner did not give rebates to the unrelated stores.

The effect of the rebates was to lower petitioner's profits and increase the profits (or lower the losses) of the stores receiving the rebates.

The taxable income of petitioner and the related entities before and after the rebates was as follows:

|  | Taxable Income Before Rebates | Taxable Income After Rebates |
|---|---|---|
| **Fiscal Year 1991** | | |
| Petitioner | $292,000 | $116,124 |
| Kapsco | (107,987) | 12,013 |
| NPC | (56,899) | 149 |
| | | |
| **Fiscal Year 1992** | | |
| Petitioner | 251,323 | 96,232 |
| NPC | (113,993) | 1,009 |
| KAW | 13,544 | 53,544 |

Petitioner determined the amount of rebates at the end of each fiscal year by giving consideration to its own taxable income as well as that of the related entities. The rebates were based neither on volume discounts petitioner received from its suppliers nor on the volume of sales petitioner made to the related entities. Indeed, petitioner sold approximately the same quantity of merchandise to its related entities each year. Further, there is nothing in the record to suggest that the rebates were tied to any benefits that petitioner received from the related stores.

The Related Stores' Financial Condition

a. Kapsco

Kapsco's fiscal year 1991 financial statements (which included the financial results of 9-10 individual retail stores) reflected total shareholders' equity of $419,322 and retained earnings of $274,868. In that year, Kapsco received from petitioner $120,000 in rebates. (Had there been no rebates in fiscal year 1991, Kapsco's total shareholders' equity would have been $299,322 and retained earnings would have been $154,868.)

At the end of fiscal year 1991, Kapsco had the following assets:

| | |
|---|---|
| Inventory | $943,252 |
| Accounts receivable | 239,072 |
| Cash in bank | 83,709 |
| Total | 1,266,033 |

At the end of fiscal year 1991, Kapsco's current liabilities totaled $804,108, of which $794,252 represented accounts payable to petitioner. (Had there been no rebates in fiscal year 1991, Kapsco's current liabilities would have totaled $924,108.)

Kapsco's shareholders reported the following amounts of taxable income for 1991 on their respective Forms 1040:

| | |
|---|---|
| M. Kirkham | $24,709 |
| J. Kirkham | 44,285 |
| L. Sponenburgh | 33,750 |
| O.R. and R. Kirkham | 28,567 |

The record does not indicate the bases of these shareholders in their Kapsco stock during the years at issue.

### b. KAW

KAW's fiscal year 1992 financial statement reported total shareholders' equity of $940,062 and retained earnings of $668,632. In that year, KAW received $40,000 in rebates. (Had there been no rebates in fiscal year 1992, KAW's retained earnings would have been $628,632, and KAW would have had a $13,544 profit.)

At the end of fiscal year 1992, KAW had the following assets:

| | |
|---|---|
| Inventory | $746,421 |
| Accounts receivable | 213,299 |
| Cash in bank | 34,417 |
| Total | 994,137 |

At the end of fiscal year 1992, KAW's current liabilities totaled $922,081, of which $911,757 represented accounts payable to petitioner. (Had there been no rebates, KAW would have had current liabilities totaling $962,081.)

### c. NPC

NPC's financial statements for fiscal years 1991 and 1992 reported retained earnings of approximately $40,000 for each year. During those fiscal years, NPC received rebates of $56,548 and $115,000, respectively.

NPC had the following assets at the end of fiscal year 1991:

| | |
|---|---|
| Merchandise inventory | $268,860 |
| Accounts receivable | 46,203 |
| Cash in bank | 11,488 |
| Total | 326,551 |

At the end of fiscal year 1991, NPC had current liabilities totaling $305,663, of which $304,353 was accounts payable to petitioner. (Had there been no rebates, NPC would have had current liabilities totaling $362,211.)

NPC had the following assets at the end of fiscal year 1992:

| | |
|---|---|
| Merchandise inventory | $269,140 |
| Accounts receivable | 55,134 |
| Cash in bank | 8,418 |
| Total | 332,692 |

NPC had current liabilities totaling $304,154 at the end of said year, of which $301,094 was accounts payable to petitioner. (Had there been no rebate, NPC would have had current liabilities totaling $419,154.)

Petitioner's Certified Public Accountant

Philip Lamprecht of Jordan & Co. was petitioner's accountant. Mr. Lamprecht recommended the amount of the rebates to be given to each of petitioner's related stores. In making his recommendations, which was done after consulting M. Kirkham, Mr. Lamprecht considered the profitability of petitioner and its related entities. He treated all the entities as one business operation. In addition, Mr. Lamprecht analyzed the liquidity of each of the related stores and the related stores' ability to pay their receivables. He took that ability into consideration in determining the amount of the rebate to be given to each store.

Petitioner's Bookkeeping

Petitioner and the related entities employed the accrual method of accounting. Petitioner booked sales to both related and unrelated entities when the merchandise was delivered, debiting accounts receivable and crediting sales. Petitioner's related stores accounted for the delivery of petitioner's merchandise to the stores by crediting an account payable to petitioner and debiting purchases.

Petitioner accounted for the rebates by crediting accounts receivable and debiting sales, thereby eliminating the amount of the rebate from accrued sales for Federal income tax purposes. Petitioner's related stores to which the rebates were given

accounted for the rebates by debiting their accounts payable and crediting purchases.

Petitioner kept track of the aging of receivables from unrelated stores through monthly computer reports. Ralph Dunn, petitioner's office manager, reviewed the accounts receivable aging sheets. Accounts that were not collected were sent to collection agencies. Mr. Dunn prepared the list of petitioner's accounts receivable to be written off by each store and recommended the amount of writeoffs. Petitioner's officers reviewed the list of proposed writeoffs of accounts, which was sent to Mr. Lamprecht at the end of each year. Generally, Mr. Dunn's recommendations were accepted.

After petitioner wrote off the delinquent accounts from unrelated entities, petitioner stopped selling merchandise to them.

Petitioner did not keep records to reflect the aging of accounts receivable from related stores. Nor did Mr. Dunn recommend writeoffs for any of the related stores.

Petitioner's Federal Income Tax Returns

On its Federal income tax returns for fiscal years 1991 and 1992, petitioner reported gross sales of $7,628,708.29 and $7,736,795, respectively.

Notice of Deficiency

In the notice of deficiency, respondent determined that petitioner's gross sales for fiscal years 1991 and 1992 were

understated by $176,548 and $155,000, respectively, on the basis of the rebates petitioner gave to its related entities. Respondent determined that the reduction of petitioner's income on account of the rebates was improper because the rebates were not at arm's length. Respondent also determined that petitioner was liable for the section 6662(b)(2) accuracy-related penalties for both years at issue.

## OPINION

Issue 1.  Reallocation of Income

We first consider respondent's reallocation of income to petitioner from three of its related entities pursuant to section 482 for fiscal years 1991 and 1992.

A.  Relevant Section 482 Law

Section 482 grants the Commissioner broad discretion to scrutinize transactions between commonly controlled taxpayers and to allocate items of income, deductions, and credits between them where necessary to prevent the evasion of taxes or to ensure the clear reflection of each taxpayer's income.[2]  See, e.g., Paccar,

---

[2]    Sec. 482 provides, in pertinent part, as follows:

> In any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests,  the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such

(continued...)

Inc. & Subs. v. Commissioner, 849 F.2d 393 (9th Cir. 1988), affg. 85 T.C. 754, 785 (1985); Altama Delta Corp. v. Commissioner, 104 T.C. 424, 456 (1995); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 163 (1994); Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 352-353 (1991); Inverworld, Inc. v. Commissioner, T.C. Memo. 1996-301, supplemented by T.C. Memo. 1997-226. Section 482 is designed to prevent artificial distortion of the true net incomes of commonly controlled entities.  As this Court has stated:

> In order to prevent the artificial shifting of income from one related business to another, section 482 places a controlled taxpayer on a parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true net income of a controlled taxpayer. Thus, income which has been artificially diverted to one member of a controlled group but which in fact was earned by another member of the group may be "allocated" by the Commissioner under section 482 * * * [to] the entity which really earned it. * * * [Citations omitted.]

Huber Homes, Inc. v. Commissioner, 55 T.C. 598, 605 (1971); see also sec. 1.482-1(b)(1), Income Tax Regs.

An arm's-length standard is used to determine whether reallocations between controlled entities are necessary. The

----

[2](...continued)
distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. * * *

regulations provide a guide to identifying the "true taxable income" of each entity on the basis of the taxable income that would have resulted had the entities been uncontrolled parties dealing at arm's length. See Sundstrand Corp. & Subs. v. Commissioner, supra at 353; sec. 1.482-1(b)(1), Income Tax Regs.

The Commissioner's determination as set forth in the notice of deficiency is presumptively correct. The taxpayer has the burden of disproving that determination. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In meeting its burden, the taxpayer must prove that it did not improperly utilize its control to shift income. Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 331 (1990), affd. 961 F.2d 1255 (6th Cir. 1992). Furthermore, where the Commissioner determines that an allocation under section 482 is necessary to prevent either tax evasion or the distortion of a taxpayer's income, the determination must stand unless the taxpayer proves that the determination is unreasonable, arbitrary, or capricious. Ballentine Motor Co. v. Commissioner, 321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, supra at 164; Sundstrand Corp. & Subs. v. Commissioner, supra at 353. Absent a showing of abuse of discretion, the Commissioner's section 482 determination must be sustained. Sundstrand Corp. & Subs. v. Commissioner, supra; Bausch & Lomb, Inc. & Consol. Subs. v. Commissioner, 92 T.C. 525, 582 (1989), affd. 933 F.2d 1084 (2d Cir. 1991). "Whether respondent

has exceeded his discretion is a question of fact. * * * In reviewing the reasonableness of respondent's determination, the Court focuses on the reasonableness of the result, not on the details of the methodology used." Sundstrand Corp. & Subs. v. Commissioner, supra at 353-354.

In addition to proving that the deficiencies herein are arbitrary, capricious, or unreasonable, petitioner has the burden of proving satisfaction of the arm's-length standard. See Eli Lilly & Co. v. Commissioner, 856 F.2d 855, 860 (7th Cir. 1988), affg. on this issue, revg. in part and remanding 84 T.C. 996 (1985).

Section 1.482-1(a)(3), Income Tax Regs., provides:

> (3) The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

The term "controlled taxpayer" means "any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests." Sec. 1.482-1(a)(4), Income Tax Regs. The terms "group" and "group of controlled taxpayers" mean "the organizations, trades, or businesses owned or controlled by the same interests." Sec. 1.482-1(a)(5), Income Tax Regs.

This Court has described the requisite control under section 482 as one of "actual, practical control rather than any particular percentage of stock ownership." B. Forman Co. v. Commissioner, 54 T.C. 912, 921 (1970), affd. in part and revd. in part 453 F.2d 1144 (2d Cir. 1972). "The language of section 482 is broad and sweeping, and its application depends on a finding of either ownership or control." Collins Elec. Co. v. Commissioner, 67 T.C. 911, 918-919 (1977); Ach v. Commissioner, 42 T.C. 114, 125 (1964), affd. 358 F.2d 342 (6th Cir. 1966).

### B. The Parties' Arguments

Respondent asserts that petitioner's income as reported on its fiscal year 1991 and 1992 Federal income tax returns was understated because petitioner gave preferential rebates to its related entities. On the other hand, petitioner argues that the rebates were proper primarily because the accounts payable from the related entities were uncollectible. For the reasons set forth below, we agree with respondent.

### C. Petitioner's Controlled Group and the Effect of the Rebates

Although petitioner, Kapsco, NPC, and KAW were each separate legal entities, they were related and controlled directly or indirectly by the same Kirkham family interests during the years at issue. Given the ownership and management structure of the

entities, petitioner and its related entities clearly made up a controlled group of taxpayers for purposes of section 482.

Petitioner supplied 95 percent of its related entities' inventory. Petitioner's sales to these entities were therefore "controlled sales" for section 482 purposes.

Petitioner booked sales to both related and unrelated entities at the time the merchandise was delivered, debiting its accounts receivable and crediting its sales. The related stores accounted for delivery of this merchandise as a purchase by crediting their accounts payable to petitioner and debiting purchases. All the accounting was performed by petitioner.

Petitioner sold merchandise to all it customers (both the related and unrelated stores) at the same price. However, at the end of the year, after petitioner reviewed the financial results of the entire operation of the controlled group, petitioner made rebates only to its related stores. These rebates had the effect of lowering the cost of the merchandise sold to the entities receiving the rebates, which in turn reduced petitioner's income and increased the incomes of the related stores.

Petitioner gave preferential rebates totaling $176,548 and $155,000 in fiscal years 1991 and 1992, respectively. Petitioner accounted for these rebates by crediting accounts receivable and debiting sales, thereby eliminating the rebated sales from accrued sales for Federal income tax purposes. For the related entities,

the rebates were reflected as a debit in accounts payable to petitioner and a credit to purchases.

Respondent asserts, and we agree, that the price petitioner charged its related stores for merchandise sold was not at arm's length because of the rebates. The overall effect of the rebates was to shift income from petitioner to its related entities. Because this shift of income resulted from controlled transactions that were not at arm's length, petitioner and its related entities did not report their true taxable incomes. As a consequence, petitioner was able to reduce the correct amount of taxes it owed. Losses that could not advantageously be used by related entities in essence were shifted to benefit petitioner. (Without the rebates, both Kapsco and NPC would have had losses for Federal income tax purposes which would have gone unused in the years at issue.)

Mr. Lamprecht claims that he reviewed the accounts receivable due petitioner from the related entities and determined the amounts that were uncollectible. According to Mr. Lamprecht, it was this uncollectible amount that determined the amount of the rebate. Further, Mr. Lamprecht claims the uncollectibility of the receivables justified petitioner's shifting (reduction) of income. Mr. Lamprecht testified that in determining the related entity's ability to pay, he revalued the related entity's assets (at the end of the fiscal year) on the basis of the amount that could be received if the entity were to be liquidated. We believe this

assumption to be flawed--none of the related entities were in fact liquidated, and there is no evidence to suggest that a liquidation was contemplated.  Rather, the record indicates that each of the related entities was a going concern. Thus, in our opinion, Mr. Lamprecht's determination as to the financial position of the related entities does not correctly reflect the entities' ability to pay their accounts payable to petitioner.

We believe the rebates were made solely to reduce taxes for the Kirkham family as a whole.  We are mindful that current tax law provides that in order for losses of an S corporation, such as Kapsco, to pass through to its shareholders, the shareholders must have sufficient bases in their stock and debt to absorb the loss. Sec. 1366(d)(1).  In the instant case, there is no evidence that Kapsco's shareholders had sufficient bases in 1991 to absorb Kapsco's losses before the rebates.

It would appear that it was financially advantageous for the losses that otherwise would have gone to the Kapsco shareholders (the Kirkham family) to instead be used to reduce petitioner's income.

Similarly, before the rebates, NPC showed losses of ($56,899) and ($113,993) in fiscal years 1991 and 1992, respectively. A review of NPC's original Federal income tax returns for those years indicates that these losses would have gone unused in the years at issue.

(At the time NPC's original returns were filed for fiscal years 1991 and 1992, it was reported that KAW owned 75 percent of NPC. Under these circumstances, KAW could not have filed a consolidated return with NPC, enabling some of NPC's losses to be used against KAW's income. Secs. 1501, 1504. Thus, NPC's losses could not have been used to reduce any other taxable liability of the group. Subsequently, during preparation for trial, petitioner discovered the error in the original filing of the NPC returns; KAW in fact owned 100 percent of NPC.)

### D.  The Rebated Amounts Were Not Bad Debts

Petitioner contends that the rebates were not an attempt to avoid income taxation; but rather, because the rebates were given on the basis of the lack of collectibility of the accounts receivable from the related entities, the rebated amounts should be treated as bad debts.

Section 166(a) provides a deduction for any debt that becomes worthless during the taxable year. The amount of the deduction for a bad debt is limited to the taxpayer's adjusted basis in the debt as provided in section 1011. Sec. 166(b); Perry v. Commissioner, 92 T.C. 470, 477-478 (1989), affd. without published opinion 912 F.2d 1466 (5th Cir. 1990). Whether, and when, a debt becomes worthless is determined by inspecting the facts and circumstances. Sec. 1.166-2(a), Income Tax Regs. Assuming a debt is recoverable only in part, the amount of such a debt charged off within the

taxable year is allowable as a deduction. A debt will generally be considered worthless only when it can be reasonably expected that the debt is without possibility of future payment and legal action to enforce the debt would not result in satisfaction. Hawkins v. Commissioner, 20 T.C. 1069 (1953). The taxpayer bears the burden of proving that the debt had value at the beginning of the taxable year and that it became worthless during and prior to the end of that year. Millsap v. Commissioner, 46 T.C. 751, 762 (1966), affd. 387 F.2d 420 (8th Cir. 1968). In other words, the taxpayer must demonstrate what part of the debt is worthless. Sec. 1.166-3(a)(2)(iii), Income Tax Regs. In the case of a partial writeoff of a bad debt, the question is whether the Commissioner's discretion was abused. Brimberry v. Commissioner, 588 F.2d 975, 977 (5th Cir. 1979), affg. T.C. Memo. 1976-209.

Here, petitioner is claiming a partial worthlessness of the debts at issue; that is, the accounts payable to petitioner were worthless to the extent of the rebates. As discussed hereafter, petitioner failed to prove that any portion of the accounts payable to petitioner from its related entities was worthless and thus uncollectible.

### 1. KAW

There is no evidence that KAW's accounts payable to petitioner were partially worthless. Petitioner gave a $40,000 rebate to KAW in fiscal year 1992. In that year, KAW: (1) Had retained earnings

of $628,632 before the rebate and $668,632 after the rebate; (2) was in a profit position both before ($13,544) and after ($53,544) the rebate; and (3) had sufficient current assets to cover its current liabilities (i.e., it had sufficient short term liquidity in fiscal year 1992 to cover the accounts payable written off via the rebate).

Clearly, KAW's financial statements do not reflect that its accounts payable to petitioner were uncollectible in the amount of the rebate. Rather, in our opinion, petitioner gave the rebate in order to shift income from itself to KAW, where the income would be taxed at between 15 to 25 percent compared to petitioner's 34-percent tax rate.

### 2. Kapsco

There is no evidence that Kapsco's accounts payable to petitioner were partially worthless. In fiscal year 1991, petitioner gave rebates totaling $120,000 to Kapsco. These rebates were given to four unincorporated Kapsco units (Idaho Falls--Park, Pocatello, Rigby, and Rexburg). Because these particular entities did not have strong financial conditions, Mr. Lamprecht believed that the accounts payable were uncollectible, thereby justifying the rebates to Kapsco.

However, Kapsco's financial statement reflects that it was capable of meeting its accounts payable obligation. It is irrelevant whether the financial condition of the four

unincorporated stores to which the rebates were given had weak financial conditions; rather, the financial condition of Kapsco is the financial condition that is pivotal.  In fiscal year 1991, before the rebates were given, Kapsco had retained earnings of $154,868, total shareholders' equity of $299,322, and a $107,987 loss.  However, evidence of operating losses, without more, does not establish worthlessness of a debt.  See Trinco Indus., Inc. v. Commissioner, 22 T.C. 959, 965 (1954).  The mere fact that losses exist or that an obligation will be difficult to collect does not determine worthlessness.  Riss v. Commissioner, 56 T.C. 388, 407 (1971), affd. 478 F.2d 731 (8th Cir. 1973).

We are satisfied that Kapsco had sufficient liquidity at the end of fiscal year 1991 to cover the written off accounts receivable (Kapsco had a $341,925 cushion of its current assets over its current liabilities to pay its accounts payable, even before the rebates at issue).  Accordingly, petitioner has failed to prove that Kapsco's accounts payable were uncollectible.

### 3.  NPC

There is no evidence that NPC's accounts payable to petitioner were partially worthless.  Petitioner gave rebates of $56,548 and $115,000 in fiscal years 1991 and 1992, respectively, to NPC. NPC's financial condition was certainly the weakest of the three entities to which the rebates were given.  However, even here,

petitioner has failed to provide any evidence that NPC could not have paid the majority of its accounts payable to petitioner.

Before the rebates, NPC had net losses of $56,899 in fiscal year 1991 and $113,993 in fiscal year 1992. Here again, evidence of an operating loss is not sufficient to prove worthlessness when there are current assets available to pay current debts. Even where a business is shown to be insolvent as its liabilities exceed its assets, evidence of insolvency based on book figures does not necessarily establish worthlessness. Brimberry v. Commissioner, supra at 976; Trinco Indus., Inc. v. Commissioner, supra. Where an entity is still actively engaged in business and has assets sufficient to pay off a greater part of the loan, the debt is not considered worthless. Trinco Indus., Inc. v. Commissioner, supra. In NPC's case, it was still actively engaged in business.

It appears that NPC had sufficient current assets to cover 90 percent of total current payables to petitioner in fiscal year 1991 and 79 percent of total current payables in fiscal year 1992. Any arm's-length creditor of NPC would not have been content to write off NPC's accounts payable owed to the creditor. Petitioner again has failed to provide sufficient evidence that its rebates to NPC during the years at issue were based on bad debts.

### 4.  Other Evidence

The record contains other evidence contradicting petitioner's argument that the writeoffs were worthless. First, petitioner kept

detailed and monthly updated computer records of the aging of the unrelated entities' accounts receivable. Mr. Dunn, petitioner's office manager, ultimately recommended to petitioner's accountant the accounts to be written off. In contrast, petitioner kept no records for the aging of accounts receivable of its related entities and had no comparable procedure with respect to these debts. Petitioner did not consider the aging of its related entities' receivables to be a "problem".

Next, the evidence of petitioner's sales to the related entities in the years following the rebates at issue belies petitioner's claims that the receivables were uncollectible. Petitioner admitted that if it wrote off an account of an unrelated party, it would not continue to sell to that party in the next year. But this has not been the case with petitioner's related entities. Petitioner continued selling to the related entities, and in some instances, it actually increased its sales to the related entities following the year of the rebate. Accordingly, it would not appear that petitioner took seriously the uncollectible accounts from its related entities.

Finally, through the testimony of its accountant, Mr. Lamprecht, petitioner stated its belief that its income was too high during both years at issue. Petitioner therefore attempted to reduce its taxable income by extending the rebates.

In sum, we hold that petitioner has failed to establish that the receivables at issue were bad debts pursuant to section 166.

### E. Petitioner Was Required To Accrue Sales Income When All Events Had Occurred That Fixed the Right To Earn the Income and the Amount Was Determinable With Reasonable Accuracy

Petitioner further contends that it should not have to book each sale as income in the year the sale took place because the accounts receivable (from the related entities) were uncollectible. Respondent argues that petitioner was required to accrue the sales income in the year of sale and that the accounts were collectible. We agree with respondent.

The general rule for the taxable years of inclusion of income appears in section 451. Section 451(a) requires:

> The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

Section 1.451-1(a), Income Tax Regs., provides that if the taxpayer is on the accrual basis, the income must be included in income when all events have occurred that fix the right to receive such income and the amount thereof can be determined with reasonable accuracy (the "all-events test"). Section 446(a) provides: "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." The accrual method of accounting is one permissible method

of computing taxable income. Sec. 446(c)(2). Section 1.446-1(c)(ii), Income Tax Regs., provides:

> Accrual method. Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. * * *

The accrual method does not focus on the time of payment or receipt, but rather upon the time there is an obligation to pay or a right to receive. See United States v. Hughes Properties, Inc., 476 U.S. 593, 599 (1986); Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184-185 (1934).

Petitioner, an accrual method taxpayer, booked all its sales at the time the merchandise was shipped. At that time, petitioner had a legally enforceable right to receive payment for the merchandise. At the end of the year, petitioner decided the amount of rebates it would extend and reversed the sales entries, thereby not accruing the sales income previously booked. Under the all-events test, petitioner was required to accrue the income in the year the sales were made to its related entities.

Petitioner failed to prove that the amounts were not collectible during the years at issue. Furthermore, any uncertainty as to collection that would justify nonaccrual of income must be substantial and not simply technical. See Stephens Marine, Inc. v. Commissioner, 430 F.2d 679, 685 (9th Cir. 1970),

affg. T.C. Memo. 1969-39. We thus conclude that petitioner has failed to prove any substantial uncertainty as to collection.

F.  Conclusion

The income petitioner reported on its Federal income tax returns for fiscal years 1991 and 1992 did not clearly reflect its income.  Petitioner was not justified in shifting income between itself and its related entities. By granting the rebates, petitioner essentially sold merchandise at non-arm's-length prices to its related entities, and arbitrarily shifted income between itself and its related entities.[3]  Petitioner has failed to prove that: (1) Respondent's determination was arbitrary, capricious or unreasonable; and (2) petitioner sold goods at arm's-length prices to its related entities.  Accordingly, respondent properly reallocated income between petitioner and its related entities under section 482, and we hold for respondent on this issue.

Issue 2.  Section 6662(b)(2) Accuracy-Related Penalties

The second issue is whether petitioner is liable for the section 6662(b)(2) accuracy-related penalties for fiscal years ended March 31, 1991 and 1992.  Respondent contends that petitioner is liable for the penalties in connection with both petitioner's

---

[3]  Petitioner claims that it was forced to shift income among its related entities because it was a victim of competitive forces over which it had no control. We are unpersuaded by petitioner's argument.  Petitioner chose to operate its business under the existing market conditions.  Petitioner cannot ignore the reality of the businesses it selected.  It was bound by the structure it chose.

improper extension of rebates to its related entities and petitioner's improper writedown of ending inventory for the years at issue. Although petitioner conceded the ending inventory issue, petitioner argues that these penalties are inapplicable to both issues.

Section 6662(b)(2) imposes a penalty equal to 20 percent of the portion of an underpayment of tax that is attributable to any substantial understatement of tax. Sec. 6662(a) and (b)(2). An understatement of tax is substantial in the case of a corporation when it exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Sec. 6662(d)(1)(B). The amount of an understatement will be reduced if a taxpayer has substantial authority for the way an item was treated, or if the facts that affect the item's tax treatment are adequately disclosed in the return. Sec. 6662(d)(2)(B). A taxpayer has the burden of proving that the Commissioner's determination of an addition to tax is in error. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

The accuracy-related penalty does not apply to any portion of an underpayment if there was reasonable cause for such portion and the taxpayer acted in good faith. Sec. 6664(c)(1). Such a determination is made by taking into account all facts and circumstances, including the experience, knowledge, and education of the taxpayer and reliance on a professional tax adviser. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner's income taxes for fiscal years 1991 and 1992 were substantially understated as a result of (1) giving rebates to its related entities for which it has shown no economic justification other than to avoid taxation, and (2) writing down its ending inventory in the respective amounts of $160,000 and $415,000 in fiscal years 1991 and 1992. Our discussion in Issue 1 leaves no doubt that petitioner had no reasonable basis or substantial authority for its position of giving the rebates. We will hereinafter discuss whether petitioner was justified in writing down its ending inventory.

Petitioner maintained a perpetual inventory system. On a daily basis, purchase invoice amounts were plugged into petitioner's computer and sales were taken off on a daily sales sheet, leaving an inventory balance. Each month, if amounts sold were greater than purchases, ending inventory would be lower than the previous month. If amounts sold were less than purchases, ending inventory would be higher than the previous month. At yearend, petitioner relied on its perpetual inventory system and took no physical inventory of goods on hand. As new inventory was purchased, petitioner updated its book inventory cost per unit on the basis of the most recent invoice price from suppliers. Petitioner had no significant amounts of obsolete inventory in stock in the years at issue. If inventory became obsolete, petitioner's suppliers would normally accept the inventory in

exchange for different inventory. Petitioner's ending inventory was not written down because of obsolescence.

By writing down its ending inventory at the end of fiscal years 1991 and 1992 by $160,000 and $115,000, respectively, petitioner reduced taxable income by these amounts. Petitioner has failed to provide a valid reason for the writedowns. Mr. Dunn provided no reason to believe that the inventory balances on record as a result of the perpetual inventory system were inaccurate.

Moreover, Mr. Lamprecht testified that one factor he relied upon to determine the ending inventory writedown was petitioner's high gross profit percentage compared to prior years. However, petitioner provided no evidence of how the writedown was established or the computations petitioner used. Petitioner was simply unable to demonstrate to us that ending inventory was understated on its books.

In sum, there was no reasonable basis or substantial authority for petitioner's positions with regard to the rebates or the inventory writedown. There was also no disclosure on the returns of the relevant facts affecting the tax treatment of these items. Accordingly, we hold that petitioner is liable for the section 6662(b) penalties for substantial understatements of taxable income in connection with the rebates to its related entities and the writedown of ending inventory for fiscal years 1991 and 1992.

To reflect the foregoing and petitioner's concessions,

<u>Decision will be</u>

<u>entered for respondent</u>.